

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00305-CV

_____


IN THE INTEREST OF B.C., A CHILD

---

On Appeal from the 43rd District Court
Parker County, Texas
Trial Court No. CV21-0450

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In 2013, Appellee Mother[1] filed a suit affecting the parent–child relationship (SAPCR), asking the trial court to appoint her and Appellant Father as joint managing conservators of their child B.C., who is severely autistic and nonverbal. Two years later, Mother and Father entered an agreed order under which Mother had the exclusive right to designate B.C.'s primary residence within a geographic restriction of Johnson County and contiguous counties.[2]

Six years later, Mother filed a petition to modify or lift the geographic restriction to accommodate her upcoming move to Florida. Father counterpetitioned, seeking, among other things, to modify the restriction to Parker County, Hood County, and their contiguous counties. Around five months later, after a temporary-orders hearing, Mother filed a notice of her intent to move to Florida

---

[1]We identify the child's family by their relationship to him and the child by his initials. *See* Tex. Fam. Code Ann. § 109.002(d).

[2]The parties did not offer into the record a copy of their 2015 agreed order, but the trial court took judicial notice of its file, and Mother states in her appellee's brief that the previous geographic restriction was to Johnson County and its contiguous counties. Under Rules of Appellate Procedure 38.1(g) and 38.2(a)(1), we will accept this fact as true because Father has not contradicted it. *See* Tex. R. App. P. 38.1(g), 38.2(a)(1). As relevant below, we also will take judicial notice that Johnson County is contiguous with Parker, Hood, and Somervell Counties. *See* North Central Texas Council of Governments (NCTCOG), DFW Maps, https://www.dfwmaps.com (last visited Mar. 6, 2026); *see also* Tex. R. Evid. 201(b)(2) (allowing a court to take judicial notice of a fact that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned).

within sixty days so that B.C. would "have access to much better therapy centers and schools." In the notice, she also stated, "In the hearing that took place on April 7, 2022[,] it was determined that [Father had] moved outside of the geographic restriction and [that] the judge ha[d] ruled to lift [Mother's] geographic restriction per current orders."

A year and a half later—at trial—the parties read into the record their partial agreement and asked the trial court to decide the geographic-restriction and travel-expense-payment issues. At the trial's conclusion, the trial court expanded the geographic restriction to "the continental 48 states" and ordered Mother to pay travel expenses. Around a year and a half after the trial, the trial court signed the thirty-page judgment, which included these terms.

As pertinent to this appeal, the trial court's judgment designated Mother as the conservator with the exclusive right to designate B.C.'s primary residence within a geographic restriction of "the continental United States." *See* Tex. Fam. Code Ann. § 153.134(b)(1)(A)–(B) (stating that in rendering a joint-managing-conservatorship order, the trial court shall either "establish, until modified by further order, a geographic area within which the conservator shall maintain the child's primary residence" or "specify that the conservator may determine the child's primary residence without regard to geographic location"). The judgment also ordered Father to purchase round-trip airfare for himself and B.C. "no later than fourteen days in advance," with "the right to purchase any class of airline ticket he so chooses but any

3

costs that exceed[] $800.00 per ticket above basic economy he shall be responsible for," and ordered Mother to reimburse Father for the tickets within thirty days of their purchase.

Father has appealed, complaining in a single issue that the evidence is legally and factually insufficient to support the geographic restriction. Because the record reflects no abuse of discretion by the trial court, we overrule Father's sole issue and affirm the trial court's judgment.

## II. Discussion

We begin with the standard of review and applicable law, followed by the parties' arguments, the case's proceedings, and then our analysis.

### A. Standard of review and applicable law

Geographic restrictions fall within the ambit of conservatorship orders, which we review for an abuse of discretion. *See In re E.D.*, No. 02-20-00208-CV, 2022 WL 60781, at *15 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.). No abuse of discretion occurs when the trial court decides an issue based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *In re S.C.*, No. 02-23-00121-CV, 2024 WL 637250, at *3 (Tex. App.—Fort Worth Feb. 15, 2024, no pet.) (mem. op.).

In family-law cases, the abuse-of-discretion standard overlaps with the traditional sufficiency standards of review; thus, legal and factual insufficiency are not independent reversible grounds but are relevant factors in assessing whether the trial

4

court abused its discretion. *Id.* To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have sufficient evidence upon which to exercise its discretion, and (2) did the trial court err in its application of that discretion? *Id.* The applicable sufficiency review comes into play in the first question. *Id.* We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.*

With regard to legal sufficiency, there is no evidence when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Anything more than a scintilla of evidence is legally sufficient to support a finding. *S.C.*, 2024 WL 637250, at *4. On the other hand, no more than a scintilla exists when the evidence offered to prove a vital fact is so weak that it creates no more than a mere surmise or suspicion of its existence. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 397 (Tex. 2019).

As to factual sufficiency, we will set aside a finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered.

*Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g).  We must be cognizant that the trial court is in a better position to decide custody cases because it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate each parent's claims.  *C.B. v. A.B.*, No. 02-19-00041-CV, 2020 WL 241382, at *5 (Tex. App.—Fort Worth Jan. 16, 2020, no pet.) (mem. op.).  When, as here, the trial court does not make findings of fact and conclusions of law, we imply that it made all findings necessary to support its order.  *E.D.*, 2022 WL 60781, at *11.

Texas does not have a specific statute regarding custody-case residency restrictions, but the supreme court set out factors in *Lenz v. Lenz*, 79 S.W.3d 10, 14–16 (Tex. 2002), to give meaning to Family Code Section 153.001's public-policy imperative.  *See C.B.*, 2020 WL 241382, at *6 & n.1 (discussing *Lenz*).  Section 153.001 recites that the state's public policy is to (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the child's best interest; (2) provide a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after they have separated or dissolved their marriage.  Tex. Fam. Code Ann. § 153.001(a)(1)–(3).  The child's best interest "shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."  *Id.* § 153.002(a).

In *Lenz*, the supreme court listed as relevant to determining whether a geographic restriction is in a child's best interest the following nonexclusive factors: (1) the reasons for and against the move, including the parents' good-faith motives in requesting or opposing it; (2) health, education, and leisure opportunities afforded by the move; (3) the degree of economic, emotional, and educational enhancement for the custodial parent and child; (4) the effect on extended family relationships; (5) accommodation of the child's special needs or talents; (6) the effect on visitation and communication with the noncustodial parent to maintain a full and continuous relationship with the child; (7) the possibility of a visitation schedule allowing the continuation of a meaningful relationship between the noncustodial parent and child; and (8) the ability of the noncustodial parent to relocate. *See C.B.*, 2020 WL 241382, at *6 (summarizing factors from *Lenz*, 79 S.W.3d at 15–16). The supreme court recognized that these cases are intensely fact-driven and require balancing these factors. *Id.*; *see Lenz*, 79 S.W.3d at 15–16.

## B. The parties' arguments

Father contends that the trial court abused its discretion by enlarging the geographic restriction to the continental United States because no evidence or insufficient evidence was presented to support its determination that Mother should be allowed to establish the child's residence beyond the parties' agreement that a restriction would be in place that would include Texas (where he resides) and Manatee County, Florida (where she resides).

Mother responds that the trial court acted within its discretion by effectively eliminating any meaningful geographic limitation based on (1) Father's relocation outside of the prior geographic restriction, which she claims lifted the restriction under the 2015 agreed order's terms; (2) Father's representation at trial that no restriction was required if his travel expenses were addressed; and (3) Mother's relocation, which was based on B.C.'s needs. She also points out that on this record, even if the prior restriction had remained in effect, "or if both parties had not requested that no restriction be imposed, [Father's] consistent pattern of missed visitations and unpaid support obligations significantly undermines any claim that the absence of a geographic restriction has harmed or would harm the parent–child relationship."

## C. The case's proceedings

We summarize the proceedings to provide context for the trial court's decision.

### 1. April 7, 2022 temporary-orders hearing and April 11, 2022 notice

At the April 2022 temporary-orders hearing,[3] Father recalled that when Mother's counsel deposed him the preceding December, he had testified that he did not have an address for his residence but that he had been living in a recreational vehicle between Granbury and Glen Rose near his construction-superintendent job in Somervell County. By April 2022, however, he had been living in Stephenville (Erath

---

[3]The parties each changed counsel more than once during the four years in the trial court. Father's first motion to substitute counsel was granted a month before the April 2022 hearing.

8

County) at his girlfriend's home for "roughly a month, month and a half" and had been receiving his mail there. He denied that he had tried to hide where he was living from Mother.

We take judicial notice that Granbury is located in Hood County and that Glen Rose is located in Somervell County; as noted above, both counties are contiguous to Johnson County. *See* NCTCOG, DFW Maps, https://www.dfwmaps.com (last visited Mar. 6, 2026); *see also* Tex. R. Evid. 201(b)(2). Johnson County and Hood County are contiguous to Parker County, where B.C. lived with Mother when she filed the SAPCR and a motion to transfer the SAPCR from Johnson County to Parker County. *See* NCTCOG, DFW Maps, https://www.dfwmaps.com (last visited Mar. 6, 2026). However, Erath County is not contiguous to Johnson County or Parker County. *See id.*

Four days after the hearing, Mother filed the relocation notice in which she asserted that "it was determined that [Father had] moved outside of the geographic restriction" and that the trial court had lifted it.

### 2. September 25, 2023 trial

At trial, Mother's counsel read into the record the parties' partial agreement that the 2015 order's terms would remain in effect with minor modifications, including the geographic restriction to include Mother's "current residence in the [S]tate of Florida." Two of the remaining issues for the trial court to determine were

9

the "[g]eographic restriction of the parties within the parameters of this agreement" and "payment of airfare for long[-]distance travel."

After Mother's counsel read the parties' agreement into the record, Father's counsel stated, "We would agree to no geographical restriction on [Mother] if she would pay the travel" for B.C. and his chaperone. He concluded, "So if the court is inclined to do that, we agree there doesn't need to be a geographical restriction on the child."[4]

Mother's counsel replied that payment of travel costs was "the subject of ongoing negotiation in this case." He disagreed that it should be coupled to the geographic restriction but also noted, "[T]hat's in the purview of this [c]ourt." The trial court then told Mother's counsel to call his first witness.

### a. Mother's testimony

Mother testified that then-ten-year-old B.C. had severe autism and was nonverbal, requiring extensive supervision and a communications app to express his needs. In Florida, he was attending a private education center for special-needs children where he also received Applied Behavioral Analysis (ABA) therapy. Mother had been covering B.C.'s health insurance, first under her new husband's employer's plan and ultimately through a Florida policy that she described as "very robust" because it covered B.C.'s ABA therapy with no age limit or cap on how many sessions he could have.

---

[4]Father changed counsel around a year before the September 2023 trial.

Mother and her new husband had married in June 2022. She asked the trial court to consider imposing no geographic restriction because her understanding was that she had been allowed to move to Florida after Father had moved outside of the 2015 agreed order's geographic restriction. According to Mother, limiting them to Manatee County (in the Tampa area) would be a hardship if she and her husband had to move to a different area in Florida, such as the Miami area, but such a move would not impose any additional flight obligation on B.C. or Father.

Regarding Father's proposal of no geographic restriction in return for Mother's paying all travel costs, Mother testified in the following colloquy that it would be fair for her to pay part of the travel expenses but not "100 percent" of them:

> Q. Okay. I'm certain that you heard [Father's counsel] discuss the ideas that [Father] wouldn't have a residency restriction issue if you paid for all of the flights. Did you hear him say that?
>
> A. Yes.
>
> Q. Do you think it's appropriate in this case that you pay for all of the flights for [B.C.]?
>
> A. I can definitely understand since I am the one who did choose to move to Florida, but given the situation, I don't believe it's fair for me to have to pay 100 percent of them.
>
> Q. Well, please give me more of that. Why?
>
> A. Well, [B.C.]'s [private-school] tuition . . . we paid out of pocket for.[5] And I understand that moving forward we will still be, you know,

---

[5]Mother testified that the annual tuition for B.C.'s private school in Florida was $12,000 but that B.C. had received a scholarship for the 2023–2024 school year that reduced the tuition burden to around $100 per month.

responsible -- or, I'm sorry, I will still be responsible for that, which I am glad to pay. . . .

Q. . . . [W]hy should the [c]ourt consider not ordering you to pay all of the travel expenses associated with [B.C.'s] visitation with his father? So I'm going to cut to the chase and assume that educational costs that you're obligated to pay should be considered, is that one?

A. Yes.

Q. Okay. Are there any others?

A. Well, the amount of child support because we did do a -- we filed a petition in 2021 to increase child support and that has not taken place. So definitely an increase in child support to the current guidelines, and then also health[-]insurance reimbursement.[6]

Mother expressed concern about obligating herself to pay for Father's flights in light of his having previously failed to regularly pay child support or to exercise all of his periods of possession with B.C. from 2015 until she filed her petition to modify in 2021. Specifically, she testified that from 2015 to 2020, despite their living in the same geographic area, Father had exercised one summer period of possession and that his weekend possession was "hit or miss" until she filed her petition. On cross-examination, she conceded that since 2021, Father had been current on his child support and had been exercising regular visitation before she and B.C. had moved to Florida.

---

[6]Mother also testified that although B.C. was able to use a toilet to urinate, he required "pull-ups" for his bowel movements; his pull-ups cost $120 per month, and his wipes cost $30 per month. B.C. was also on a special doctor-recommended diet, which was more expensive than "typical" groceries. These were facts that Mother wanted the trial court to consider in allocating travel expenses and determining child support.

### b. Father's testimony

Father testified that B.C. was his only minor child and that they had had four visits since B.C.'s move to Florida. He testified that when B.C. stayed with him over the summer in Parker County, B.C. had learned "to know when he has to poop" but was still "really dependent o[n] the [pull-ups]." He also stated that B.C. was close with his girlfriend's eleven-year-old daughter.

Regarding the travel expenses, Father testified as follows:

> Q. [(by Mother's counsel)] Now, as far as the expense of travel from Texas to where [B.C.] lives[,] *wherever he may live*, are you asking the [j]udge to have [Mother] reimburse all that travel?
>
> A. That's correct.
>
> Q. And why?
>
> A. Due to the geographical restrictions being lifted and she decided to move to Florida and put the distance between us, again, it puts a financial burden on me for having to pay for all of that cost for something she made the decision to do without prior agreement.
>
> Q. Okay. And then, sir, once the [c]ourt is able to calculate child support based on the financial information the [c]ourt has, are you also asking the [c]ourt to possibly give you a little bit of a break on your child[-]support obligation because of this extensive travel?
>
> A. That's correct. [Emphasis added.]

During Mother's counsel's questioning, Father also testified as follows:

> Q. Isn't it true that your actions lifted the geographic restriction?
>
> A. No.

Q. So you did not move outside of the geographic restriction first?

A. I did not.

Q. But that's what was found at the temporary[-]orders hearing; isn't that correct?

A. That's what was assumed, correct.

Q. Okay. Did you keep [Mother] up-to-date with your addresses?

A. No.

Q. Isn't it true that you refused to give her your address for a five-year period?

A. I don't know that it was a five-year period.

Q. For some time period?

A. For some time, yes.

. . . .

Q. [Father], does that testimony look familiar to you? That's the temporary[-]orders transcript. Where did you say you were living at that time?

A. Well, it doesn't say I was living. It said I was staying. Living and staying [are] two different things.

Q. What's the difference between living and staying?

A. Well, the staying -- or living would be that I took residency there, and I did not take residency staying at -- per these orders -- per this deal was it was there for the night. And I explained to [Mother's counsel] that --

Q. Okay. So you would just stay there one night?

14

A. I stayed there on weekends, and there's nothing in the geographic restrictions that says I can't do that.

Q. And what address were you using on your bank statements? I believe you have a few of them in front of you.

A. Yes. So when I changed the bank statement or when I changed all the banking information --

[Mother's counsel]: Objection; nonresponsive.

THE COURT: Sustained. Just answer the question, sir.

[Father's counsel]: Your Honor, I'm going to object to this line of questioning. We've agreed she can live in Florida.

THE COURT: I was wondering. What do you say?

[Mother's counsel]: Your Honor, it goes towards the blaming it on her when he -- when his actions are the ones that lifted the geographic restriction.

THE COURT: I would disagree. I think it was the [c]ourt's action that lifted the geographic restriction.

Father also denied that he had been delinquent in paying child support "[e]xcept at the very beginning." By the time of the trial, Father had lost his job as a construction superintendent and had become self-employed as a handyman.

### c. Rendition

At the trial's conclusion, the trial court announced that it would order "that the residency restriction [was] going to be the continental 48 states and [that] [M]other [was] going to pay for the travel expenses for child and for whoever that chaperone of

the child would be for the visitation that was previously announced to the court." Father did not object to the restriction at trial.

### 3. Subsequent proceedings

On December 28, 2023, Father filed a motion to enter final order with a draft order attached and asked the trial court to grant his motion and to sign the attached order. Father's draft order stated that Mother would have the "exclusive right to designate the primary residence of the child within the continental United States" and that the child's primary residence would

> be within the continental United States, and the parties shall not remove the child from continental United States for the purpose of changing the primary residence of the child until this geographic restriction is modified by further order of the court of continuing jurisdiction or by a written agreement that is signed by the parties and filed with that court.

The draft order provided for Father to buy round-trip airfare for himself and B.C. and for Mother to reimburse him for those tickets within thirty days of purchase.

Mother then filed a motion to reconsider the reimbursement provision because Father had booked flights that were more expensive than she felt necessary and asked the trial court to render an order that she should be B.C.'s escort and should be responsible for booking the flights.

#### a. March 4, 2024 hearing on motion to reconsider and motion to sign

Mother, who was pregnant at the time of the hearing, testified that B.C. would never be able to travel as an unaccompanied minor because of his disabilities. She

presented to the trial court a comparison of her travel costs with Father's, and the exhibit was admitted as a summary of her testimony.

Mother explained to the trial court that Father had been flying from Texas to Florida to pick up B.C., flying with B.C. to Texas, and then flying with B.C. back to Florida before returning to Texas. She proposed an alternative arrangement: she could fly to Texas with B.C.; stay in Texas with her mother while B.C. visited Father; and then fly back with B.C., reducing parent travel from two roundtrips to one. She asserted that Father would benefit from her proposal because he would have more time with B.C. by not having to take off the Friday each month from work to travel to Florida to pick up B.C. and that their time together could be spent doing something more fun than traveling all day on a Saturday. She also complained that Father was paying $450 per month in child support while his travel expenses, for which she had to reimburse him, were four or five times that amount.

Several months later, Father filed another motion to sign. He attached a draft order to the motion and asked the trial court to sign it. The draft order contained the same provisions as his earlier proposed order.

In April 2024, Mother's counsel withdrew. A few months later, Mother filed a pro se motion, complaining that Father had been refusing to purchase "basic economy" flights because the order did not require booking those. In May 2024, the trial court granted Father's counsel's motion to withdraw. New counsel entered an appearance for Father in September 2024.

**b. January 2, 2025 hearing on motion to reconsider and motion to sign**

Mother appeared pro se at the January 2025 hearing, and Father appeared with his new counsel. Father's counsel summarized Mother's request as essentially asking that Father "book[] the cheapest flight available," but he did not raise any challenges to the geographic restriction. Mother told the trial court the amount that Father had paid for plane tickets in September, October, November, and December 2024 and how much less he could have paid for basic-economy fares.

Father's counsel then explained that booking seats closer to the bathroom made travel better for B.C., so Father had been booking "probably the one that's right below the first class, to get you, you know, somewhere mid to upper part of the airplane" with more leg room. The parties also put their remaining insurance issue before the trial court, and Mother testified that B.C. was on an insurance plan with her husband and their new baby. Father's counsel informed the trial court that Father was "soon to be married" and then would have insurance coverage available for B.C. through his fiancée's employment.

At the hearing's conclusion, the trial court clarified its order, stating that Father could continue to book flights but would be responsible for "up to an $800 difference between basic economy and whatever else he books." Two months later, the trial court granted another motion by Father to substitute counsel.

In March 2025, after Father substituted new counsel, Mother filed a motion to sign and enter the final order and attached a draft order. As with the earlier draft orders, this one contained the same "continental United States" geographic restriction but added, per the last hearing, that Father could purchase "any class of airline ticket he so chooses but any cost[] that exceeds $800.00 per ticket above basic economy he shall be responsible for."

Two days later, Father's new counsel, who represented him through entry of the judgment and who represents him in this appeal, filed a motion to enter final order and attached a draft order to his motion. His draft order contained the same geographic-restriction and ticket-reimbursement language as Mother's, and he asked the trial court to enter the order "in the form attached to this motion" and for his motion to "be in all things granted."

### c. March 20, 2025 hearing on motion to sign and enter

At the March 20, 2025 hearing, Father's counsel announced that they had prepared a final order and that the only issue remaining was B.C.'s health insurance. The geographic restriction was not addressed by either party.

### d. Final order and motion for new trial

On March 31, 2025, the trial court signed an order with the same terms as addressed at the January 2025 hearing and draft orders proffered by the parties. The next month, Father's counsel filed a motion for new trial, complaining that the trial court had erred "by implicitly finding that the modification of the geographic area for

19

the primary residence of the child from Parker County . . . to the continental United States" was in the child's best interest "because there is no evidence or, in the alternative, insufficient evidence to support that finding on the issue of modifying the restriction on the area within which the child's primary residence may be designated." The motion for new trial was overruled by operation of law.

## D. Analysis

We begin by observing that "a party cannot complain on appeal that the trial court took a specific action that the complaining party requested, a doctrine commonly referred to as 'the invited error' doctrine." *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005). "[I]t is clear in Texas law that for a party to be estopped from asserting a position in an appellate court based on actions it took in the trial court, the party must have 'unequivocally taken a position in the trial court that is clearly adverse to its position on appeal.'" *In re S.T.*, 508 S.W.3d 482, 488 (Tex. App.—Fort Worth 2015, no pet.) (quoting *In re Dep't of Fam. & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding)); *see Am. Sav. & Loan Ass'n v. Musick*, 531 S.W.2d 581, 589 (Tex. 1975) (holding that "[o]ne of the requirements for application of the doctrine of judicial estoppel is that the statement must be deliberate, clear, and unequivocal"); *cf. SISU Energy LLC v. Hartman*, No. 02-19-00436-CV, 2020 WL 4006725, at *11 (Tex. App.—Fort Worth July 16, 2020, no pet.) (mem. op.) (holding invited-error doctrine did not apply when nothing in the record showed that the appellants had asked the trial court to sign the complained-of order).

20

At trial, Father offered no geographic restriction in exchange for payment of his travel expenses. The trial court then determined that the geographic limitation would be the "continental 48 states" and that Mother would pay the travel expenses. Despite his frequent changes in legal representation, Father remained consistent in, without objection, setting out the "continental United States" geographic restriction in his motions to enter a final order and the draft orders he attached to those motions and asked the trial court to sign. The trial court signed an order containing these terms. Father raised no complaints about them until he filed his new-trial motion, which was overruled by operation of law.

However, even if Father did not invite the trial court to commit what he now contends on appeal was error, the record does not reflect an abuse of discretion under the relevant *Lenz* factors.

Mother testified that B.C.—who was ten years old and suffered from severe autism—had access to a special school and behavioral therapy in Florida. Father presented no evidence at trial (or at any subsequent hearing) that B.C. had the same or better educational and therapy options in Texas. Similarly, Mother testified at trial about B.C.'s "very robust" Florida insurance policy that covered his ABA therapy without a cap on the number of sessions, while Father testified that he did not have

21

health insurance for B.C. at the job he had lost in July 2022.[7]  Mother's testimony presented evidence upon which the trial court could determine the health and education opportunities offered by the move, the degree of educational enhancement for B.C., and the accommodation of B.C.'s special needs.  *See C.B.*, 2020 WL 241382, at *6 (summarizing *Lenz* factors).

Further, Mother also asked the trial court to consider imposing no geographic restriction because limiting her, as the custodial parent, to Manatee County would present a hardship if she and her new husband had to move to a different area of Florida, whereas such a move would not impose any additional flight burden on Father and B.C.  Father testified that he had become self-employed as a handyman, and the trial court could have inferred that Father could do that type of work from anywhere, even though Father did not mention whether he had considered relocating to Florida.  The trial testimony presented evidence upon which the trial court (1) could assess reasons for and against imposing *any* restriction, including extrapolating a future in which Mother and her new husband might find a state other than Florida or Texas with even better opportunities for B.C., and (2) could determine that it would be in B.C.'s best interest to avoid another four years of litigation to facilitate that move.  *See E.D.*, 2022 WL 60781, at *11 (requiring the appellate court to

---

[7]Father's counsel stated at a later hearing that B.C. would have access to insurance when Father married his fiancée, but no details were provided about that insurance plan.

imply that the trial court had made all findings necessary to support its order when no fact findings were filed).

While Father testified that B.C. was close to his girlfriend's eleven-year-old daughter, the trial court could have reasonably determined that the opportunities presented to B.C. by the move outweighed his relationship with Father's girlfriend's child. The trial court also had before it Mother's testimony that Father had previously failed to pay child support or to exercise regular visitation with B.C.—despite their geographic proximity—between 2015 and 2021. It also had Father's denial that he had refused to give Mother his address for five years and his insistence—with regard to whether he had violated the previous, more limited, geographic restriction—that "living and staying" were "two different things." The trial court could have considered this in its determination of whether Father had a good-faith motive in opposing any of Mother's requests.[8] *See C.B.*, 2020 WL 241382, at \*6–9 (applying *Lenz* factors).

In light of the trial court's assessment of travel expenses against Mother for a visitation schedule that would allow the continuation of a meaningful relationship between Father and B.C. wherever B.C. might be in the continental United States, we cannot say that the trial court had legally or factually insufficient evidence upon which to make its decision or that the trial court abused its discretion by doing so.

---

[8]The trial court was aware of the parties' contentious history, noting at one point during trial, "[O]bviously, y'all aren't getting along because y'all are here in the courtroom."

Accordingly, to the extent that Father did not invite the error of which he now complains, *see Tittizer*, 171 S.W.3d at 862, we conclude that the trial court did not abuse its discretion by enlarging the geographic restriction to the continental United States, and we overrule Father's sole issue.

### III. Conclusion

Having overruled Father's sole issue, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  March 12, 2026